853 F.2d 171
 57 USLW 2092, 48 Ed. Law Rep. 336
 POLK, Ronald and Polk, Cindy, parents and natural guardians
of Christopher Polk, Appellants,
v.
CENTRAL SUSQUEHANNA INTERMEDIATE UNIT 16, Central Columbia
Area School District and Bloomsburg Area School
District, Appellees.
 No. 87-5585.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 19, 1988.
Decided July 26, 1988.
Rehearing and Rehearing In Banc Denied Aug. 19, 1988.
 
 John A. Mihalik (argued), Hummel, James & Mihalik, Bloomsburg, Pa., for appellants.
 Janet F. Stotland, Educ. Law Center, Inc., Philadelphia, Pa., for amicus curiae.
 Audrey L. Jacobsen (argued), Charles W. Craven, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, Pa., for appellee, Central Susquehanna Intermediate Unit 16.
 Gary E. Norton (argued), Derr, Pursel & Luschas, Bloomsburg, Pa., for appellee, Central Columbia School Dist.
 Before HIGGINBOTHAM and BECKER, Circuit Judges, and HUYETT, District Judge*.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This appeal requires that we examine the contours of the "free appropriate public education" requirement of the Education of the Handicapped Act, as amended, 20 U.S.C. Secs. 1401-1461, (1982) (EHA), as it touches on the delivery of physical therapy, which is a "related service" under the EHA. Ronald and Cindy Polk are parents of Christopher Polk, a child with severe mental and physical impairments. They claim that defendants, the local school district and the larger administrative Intermediate Unit (which oversees special education for students in a five-county area) violated the EHA because they failed to provide Christopher with an adequate program of special education. Specifically, plaintiffs contend that defendants' failure to provide direct "hands-on" physical therapy from a licensed physical therapist once a week has hindered Christopher's progress in meeting his educational goals.
 
 
 2
 The district court granted summary judgment in favor of defendants. The court held that because Christopher derived "some educational benefit" from his educational program, the requirements of the EHA, as interpreted by the Supreme Court in Board of Education v. Rowley, 458 U.S. 176, 206-07, 102 S.Ct. 3034, 3050-51, 73 L.Ed.2d 690 (1982), have been met, see infra at page 180-81.
 
 
 3
 We will reverse the district court's grant of summary judgment for two reasons. First, we discern a genuine issue of material fact as to whether the defendants, in violation of the EHA procedural requirement for individualized educational programs, have refused, as a blanket rule, to consider providing handicapped students with direct physical therapy from a licensed physical therapist. Second, we conclude that the district court applied the wrong standard in evaluating the appropriateness of the child's education. Although the district court relied upon language from a recent Supreme Court case, it took that language out of context and applied it beyond the narrow holding of the Supreme Court's opinion. More specifically, we believe that the district court erred in evaluating this severely handicapped child's educational program by a standard under which even trivial advancement satisfied the substantive provisions of the EHA's guarantee of a free and appropriate education. There is evidence in the record that would support a finding that the program prescribed for Christopher afforded no more than trivial progress. We will therefore reverse and remand for further proceedings consistent with this opinion.
 
 I. STATUTORY BACKGROUND
 
 4
 The EHA requires that Pennsylvania, as a recipient of federal assistance thereunder, ensure that each disabled student in the state receive a "free appropriate public education." 20 U.S.C. Sec. 1412(1) (1982). The EHA mandates that participating states provide such education for all children "regardless of the severity of their handicap." 20 U.S.C. Sec. 1412(2)(C) (1982). In pertinent part, the Act defines a free appropriate public education as:
 
 
 5
 special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge,.... and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.
 
 
 6
 20 U.S.C. Sec. 1401(18) (1982). The term "related services" includes "physical and occupational therapy ... as may be required to assist a handicapped child to benefit from special education." 20 U.S.C. Sec. 1401(17) (1982). Such special education and related services must be tailored to the unique needs of the handicapped child by means of an Individualized Education Program (IEP). 20 U.S.C. Sec. 1401(16).
 
 
 7
 An IEP is "more than a mere exercise in public relations," Georgia Ass'n of Retarded Citizens v. McDaniel, 716 F.2d 1565, 1570 (11th Cir.1983), vacated in part on other grounds, 468 U.S. 1213, 104 S.Ct. 3581, 82 L.Ed.2d 880 (1983), reinstated in relevant part, 740 F.2d 902 (1984), cert. denied, 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 365 (1985); indeed, it is the "centerpiece of the statute's education delivery system for disabled children." Honig v. Doe, --- U.S. ----, 108 S.Ct. 592, 598, 98 L.Ed.2d 686 (1988). The IEP consists of a detailed written statement arrived at by a multi-disciplinary team summarizing the child's abilities, outlining the goals for the child's education and specifying the services the child will receive. 20 U.S.C. Secs. 1401(19) (defining IEP), Sec. 1414(a)(5) (requiring an IEP). In practice the multi-disciplinary team will, as appropriate, consist of a teacher, psychologist, physician, physical and/or vocational therapist and administrator. Input is also sought from parents.
 
 
 8
 Additionally, the EHA imposes extensive procedural due process requirements upon the participating states. Complaints brought by parents or guardians must be resolved at "an impartial due process hearing." 20 U.S.C. Sec. 1415(b)(2). Any party dissatisfied with the state administrative hearing may bring a civil action in state or federal court. 20 U.S.C. Sec. 1415(e). In such action, the district court must conduct an independent review based on the preponderance of the evidence but in doing so "due weight shall be given to [state administrative] proceedings." Rowley, 458 U.S. at 206, 102 S.Ct. at 3051.
 
 II. FACTS & PROCEDURAL HISTORY
 
 9
 Christopher Polk is severely developmentally disabled. At the age of seven months he contracted encephalopathy, a disease of the brain similar to cerebral palsy. He is also mentally retarded. Although Christopher is fourteen years old, he has the functional and mental capacity of a toddler. All parties agree that he requires "related services" in order to learn. He receives special education from defendants, the Central Susquehanna Intermediate Unit # 16 (the IU) and Central Columbia Area School District (the school district). Placed in a class for the mentally handicapped, Christopher has a full-time personal classroom aide. His education consists of learning basic life skills such as feeding himself, dressing himself, and using the toilet. He has mastered sitting and kneeling, is learning to stand independently, and is showing some potential for ambulation. Christopher is working on basic concepts such as "behind," "in," "on," and "under," and the identification of shapes, coins, and colors. Although he is cooperative, Christopher finds such learning difficult because he has a short attention span.
 
 
 10
 Although the record is not clear on this point, until 1980, the defendants apparently provided Christopher with direct physical therapy from a licensed physical therapist. Since that time, however, under a newer, so-called consultative model,[1] Christopher no longer receives direct physical therapy from a physical therapist. Instead, a physical therapist (one of two hired by the IU) comes once a month to train Christopher's teacher in how to integrate physical therapy with Christopher's education.[2] Although the therapist may lay hands on Christopher in demonstrating to the teacher the correct approach, he or she does not provide any therapy to Christopher directly, but uses such interaction to teach the teacher. Plaintiffs do not object to the consultative method per se, but argue that, to meet Christopher's individual needs, the consultative method must be supplemented by direct ("hands on") physical therapy.[3]
 
 
 11
 In support of this position, plaintiffs adduced evidence that direct physical therapy from a licensed physical therapist has significantly expanded Christopher's physical capacities. In the summer of 1985, Christopher received two weeks of intensive physical therapy from a licensed physical therapist at Shriner's Hospital in Philadelphia. According to Christopher's parents, this brief treatment produced dramatic improvements in Christopher's physical capabilities.[4] A doctor at Shriner's prescribed that Christopher receive at least one hour a week of direct physical therapy. Because the defendants were unwilling to provide direct physical therapy as part of Christopher's special education program, the Polks hired a licensed physical therapist, Nancy Brown, to work with Christopher at home. At the time of the hearing, she was seeing Christopher twice a week.
 
 
 12
 Plaintiffs acknowledge that the school program has benefited Christopher to some degree, but argue that his educational program is not appropriate because it is not individually tailored to his specific needs, as the EHA requires. Moreover, throughout all of the administrative and judicial proceedings that we now describe, plaintiffs have maintained that to comply with the EHA the defendants must provide, as part of Christopher's "free appropriate public education," one session a week with a licensed physical therapist.
 
 
 13
 Plaintiffs first challenged Christopher's IEP before a Commonwealth of Pennsylvania Department of Education Hearing Officer. At that hearing and in later depositions, the administrator of the IU, Christopher's teachers, the IU's physical therapy consultant, Christopher's current private physical therapist and his therapist from Shriner's all testified concerning Christopher's capabilities and educational needs. The Hearing Officer found that Christopher was benefiting from his education, and that his education was appropriate.[5] This finding was affirmed by the Pennsylvania Secretary of Education.[6]
 
 
 14
 After exhausting administrative remedies to their dissatisfaction, the Polks brought suit in the district court for the Middle District of Pennsylvania. The district court initially permitted plaintiffs to conduct discovery about whether any of the 65 students in the five county intermediate unit whose IEPs call for some sort of physical therapy had received individualized "hands-on" physical therapy. Concomitantly, the court rejected defendants' motion under Fed.R.Civ.P. 12(f) to strike from the complaint the allegations that no child in the IU received direct physical therapy. Defendants refused to respond to this discovery, and the district court granted plaintiffs' motion to compel. Plaintiffs then moved for additional discovery concerning the services provided to other handicapped students. However, before the district court ruled on that request (and before the defendants provided any additional information), the district court granted summary judgment for the defendants. Relying on the Supreme Court's decision in Rowley, 458 U.S. at 206-07, 102 S.Ct. at 3050-51, the court held that the provisions of EHA had been met because Christopher had received some benefit from his education. This appeal followed.
 
 
 15
 Plaintiffs present two arguments on appeal. First, they submit that the defendants violated EHA's procedural requirements because Christopher's program is not truly individualized.[7] Plaintiffs rely, in this regard, on the defendants' failure to provide direct ("hands on") physical therapy from a licensed physical therapist to any of the children in the intermediate unit (a fact they learned during Christopher's due process hearing before the state examiner). This failure, they contend, is evidence that the defendants have an inflexible rule prohibiting direct therapy and that such a rigid rule conflicts with the EHA's mandate of providing individualized education. Plaintiffs argue that genuine questions of material fact exist as to the defendants' willingness to provide direct physical therapy under any circumstances, and that such disputes preclude summary judgment.
 
 
 16
 Second, plaintiffs assert that Christopher's education is inadequate to meet his unique needs. They claim that the district court found Christopher's education appropriate only because it applied an erroneous legal standard in judging the educational benefit of Christopher's program.III. ROLE OF PHYSICAL THERAPY IN PROVIDING A FREE
 
 APPROPRIATE PUBLIC EDUCATION UNDER THE EHA
 
 17
 For some handicapped children, the related services provided by the EHA serve as important facilitators of classroom learning. In Irving Independent School District v. Tatro, 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984), the Supreme Court unanimously held that the EHA required the provision of in-school intermittent catheterization services to a child with spina bifida so that she could attend a regular public school class. The Court distinguished between the types of related services contemplated by the EHA and the medical care that requires a doctor. In so doing, the Court explicitly acknowledged the importance of related services to the scheme of the EHA: "Congress plainly required schools to hire various specially trained personnel to help handicapped children, such as 'trained occupational therapists.' " Id. at 893, 104 S.Ct. at 3377 (quoting S.Rep.No. 94-168, p. 38 (1975)).
 
 
 18
 For children like Christopher with severe disabilities, related services serve a dual purpose. First, because these children have extensive physical difficulties that often interfere with development in other areas, physical therapy is an essential prerequisite to education. For example, development of motor abilities is often the first step in overall educational development. See P.H. Pearson & C.E. Williams, eds., Physical Therapy Services in the Developmental Disabilities 173 (hereinafter Physical Therapy ) (noting close relationship between speech and head, trunk, and arm control).[8] As we explained in Battle v. Pennsylvania, 629 F.2d 269, 275 (3d Cir.1980), cert. denied, 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981), in discussing children with severe emotional disturbances:
 
 
 19
 Where basic self-help and social skills such as toilet training, dressing, feeding and communication are lacking, formal education begins at that point. If the child masters these fundamentals, the education moves on to more difficult but still very basic language, social and arithmetic skills, such as counting, making change, and identifying simple words.
 
 
 20
 Id. at 275.
 
 
 21
 Second, the physical therapy itself may form the core of a severely disabled child's special education. This court has recognized that "[t]he educational program of a handicapped child, particularly a severely and profoundly handicapped child ... is very different from that of a non-handicapped child. The program may consist largely of 'related services' such as physical, occupational, or speech therapy." DeLeon v. Susquehanna Community School Dist., 747 F.2d 149, 153 (3d Cir.1984). In Christopher's case, physical therapy is not merely a conduit to his education but constitutes, in and of itself, a major portion of his special education, teaching him basic skills such as toileting, feeding, ambulation, etc.
 
 
 22
 IV. THE PLAINTIFFS' PROCEDURAL CLAIM (THAT CHRISTOPHER'S
 
 EDUCATIONAL PLAN WAS NOT INDIVIDUALIZED)
 
 23
 As we noted above, the plaintiffs have offered to prove that the defendants never genuinely considered Christopher's unique needs because of a rigid policy of providing only consultative physical therapy. They adduced evidence during cross examination at the state administrative hearing that none of the 65 children in defendants' intermediate unit whose IEPs call for physical therapy actually receive direct physical therapy. The plaintiffs also contend that, since the adoption of the consultative model, this rigid policy has precluded the defendants from recognizing Christopher's individual needs in violation of the EHA.[9] Plaintiffs submit that the district court did not recognize the force of this procedural argument, and hence erred in granting summary judgment when a genuine issue of material fact existed as to the willingness of the defendants to provide direct physical therapy to any child.
 
 
 24
 The defendants respond that it is, and always has been, their position that direct therapy would be provided, if needed. The therapist who consults monthly with Christopher's teacher testified before the Department of Education hearing examiner that she would provide therapy treatment directly if she determined that such therapy were appropriate. The previous physical therapy consultant and the administrator of the IU similarly claimed in testimony before the hearing examiner that direct physical therapy would be provided, if needed, but that such a case has never arisen for Christopher nor for any other student in the Unit.
 
 
 25
 Critical to resolution of this question are the Act's procedural protections. To repeat, the centerpiece of the procedural scheme is the IEP. See supra Section I. As the Supreme Court has noted, an essential protection of the EHA stems from the parental participation in the formulation of an IEP for the child's special education. See Rowley, 458 U.S. at 208, 102 S.Ct. at 3052 ("Congress sought to protect individual children by providing for parental involvement in the development of state plans and policies, ... and in the formulation of the child's individual education program."). This system of procedural protection only works if the state devises an individualized program and is willing to address the handicapped child's "unique needs." 20 U.S.C. Sec. 1401(16). Accord Rowley, 458 U.S. at 209, 102 S.Ct. at 3052.
 
 
 26
 In Battle v. Pennsylvania, 629 F.2d 269 (3d Cir.1980), cert. denied, 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981), this court held that Pennsylvania's inflexible policy of limiting special education to 180 days per year, regardless of individual need, violated the EHA. We noted that:
 
 
 27
 At the core of the Act is a detailed procedure for determining the contours of the free appropriate public education to be delivered to each child. We believe that these procedural safeguards require individual attention to the needs of each handicapped child.
 
 
 28
 629 F.2d at 280 (citations omitted). We stated that Pennsylvania's 180-day policy conflicted "with the Act's emphasis on the individual." Id. at 280. Similarly, in Georgia Association of Retarded Citizens v. McDaniel, 716 F.2d 1565 (11th Cir.1983), vacated in part on other grounds, 468 U.S. 1213, 104 S.Ct. 3581, 82 L.Ed.2d 880 (1983), reinstated in relevant part, 740 F.2d 902 (1984), cert. denied, 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 365 (1985), the Court of Appeals for the Eleventh Circuit held that the application of across-the-board findings to all profoundly retarded children in lieu of individual consideration of their unique needs was impermissible under the EHA.[10] As Georgia Association explained, the force of this conclusion, "by itself, does not impose a substantive standard on the state; it requires no more than that the state consider the need ... when developing a plan of education and related support services that will benefit a handicapped child." 716 F.2d at 1576.
 
 
 29
 In our view, a rigid rule under which defendants refuse even to consider providing physical therapy, as did the rule struck down in Battle, would conflict with Christopher's procedural right to an individualized program. Drawing all reasonable inferences in favor of the non-moving party, see Gans v. Mundy, 762 F.2d 338, 340 (3d Cir.1985), we believe that a genuine dispute exists over whether the defendants would consider, under any circumstances, offering direct physical therapy, and that this dispute is over material facts, precluding summary judgment. Concomitantly, we believe that plaintiffs should be given an opportunity to continue their discovery into this question because the existence of a rigid rule prohibiting such therapy would violate the EHA. Therefore, we will reverse and remand the district court's decision for inquiry into whether defendants possess a rigid policy prohibiting the provision of direct physical therapy to children in the IU.
 
 
 30
 V. PLAINTIFFS' SUBSTANTIVE CLAIM (THAT THE COURT MISAPPLIED
 
 
 31
 THE LEGAL STANDARD FOR EVALUATING APPROPRIATE EDUCATION)
 
 A. The Supreme Court's Opinion in Rowley
 
 32
 We begin our discussion of the substantive protections of the EHA with the Supreme Court's opinion in Board of Education v. Rowley, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), because the parties' arguments are so closely tied to that case; only in the context of Rowley can we intelligently present the parties' contentions and the district court's opinion.
 
 
 33
 Rowley concerned an eight year old deaf child, Amy Rowley, whose parents requested a full-time interpreter to assist her in school. The school district's refusal to provide this service under the EHA generated the dispute. Amy possessed some residual hearing and was an excellent lip reader. She was an above average student who performed at the level of her grade and was advancing from grade to grade in her regular public school classroom. Because of her hearing disability, she could only understand about 60% of what transpired in class. Nevertheless, she performed impressively in a "mainstreamed" classroom.
 
 
 34
 The school had made substantial efforts to assist Amy. Before her arrival at school, a number of administrators learned sign language to communicate with her. At the time of her request for a full time interpreter, the school was already providing Amy with a special FM hearing aid, speech therapy, and tutoring for the deaf. In addition, Amy's parents, who also were deaf, could communicate with the school by a teletype machine specifically installed in the principal's office for that purpose.
 
 
 35
 The Supreme Court held that Amy was not entitled to a private interpreter as part of her IEP under the EHA even though she could not follow 100% of the class' activities without such extra assistance. The Court analyzed the EHA and held that "if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a 'free appropriate public education' as defined by the Act." 458 U.S. at 189, 102 S.Ct. 3042.[11] The Court thus explained that the purpose of the Act was to provide a basic level of educational opportunity, not to provide the best education money can buy. See id. ("certainly the language of the statute contains no requirement ... that states maximize the potential of handicapped children"); id. at 197 n. 21, 102 S.Ct. at 3046 n. 21 ("Whatever Congress meant by an 'appropriate' education, it is clear that it did not mean a potential-maximizing education."); Muth v. Central Bucks Schools Dist., 839 F.2d 113, 119 (3d Cir.1988) (citing Rowley ). However desirable the goal of maximizing each child's potential may be in terms of individuals, the Court obviously recognized that achieving such a goal would be beyond the fiscal capacity of state and local governments, and that Congress had realized that fact as well.
 
 
 36
 Furthermore, the Court cautioned against too much judicial interference in the substance of the child's education. It concluded that, where a handicapped child is receiving an appropriate education, it is not the job of this court or any other to dictate educational methods to special education experts. See Rowley, 458 U.S. at 208, 102 S.Ct. at 3052 ("once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States") (citations and footnotes omitted); Rettig v. Kent City School Dist., 720 F.2d 463, 465-66 (6th Cir.1983), cert. denied, 467 U.S. 1201, 104 S.Ct. 2379, 81 L.Ed.2d 339 (1984). Instead, the Court focused on access to special education rather than the content of that education. It quoted at length the legislative history of the EHA, holding that its sponsors emphasized receipt of educational services rather than any specific form or level of educational benefit. Id. 458 U.S. at 195-97, 102 S.Ct. at 3045-46; see id. at 200, 102 S.Ct. at 3047-48 ("neither the Act nor its history persuasively demonstrates that Congress thought that equal protection required anything more than equal access"). Adverting to the legislative history, the Court concluded that "the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." Id. at 192, 102 S.Ct. at 3043.
 
 
 37
 Although the tenor of the Rowley opinion reflects the Court's reluctance to involve the courts in substantive determinations of appropriate education and its emphasis on the procedural protection of the IEP process, it is clear that the Court was not espousing an entirely toothless standard of substantive review. Rather, the Rowley Court described the level of benefit conferred by the Act as "meaningful." 458 U.S. at 192, 102 S.Ct. at 3043. As the Court explained:
 
 
 38
 By passing the Act, Congress sought primarily to make public education available to handicapped children. But in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful.
 
 
 39
 Id. (emphasis added). After noting the deference due to states on questions of education and the theme of access rather than a guarantee of any particular standard of benefit, the Court acknowledged that:
 
 
 40
 Implicit in the congressional purpose of providing access to a "free appropriate public education" is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child. It would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from that education. The statutory definition of "free appropriate public education," in addition to requiring that States provide each child with "specially designed instruction," expressly requires the provision of "such ... supportive services ... as may be required to assist a handicapped child to benefit from special education." Sec. 1401(17). We therefore conclude that the "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.
 
 
 41
 Id. at 200-01, 102 S.Ct. at 3048 (emphasis in original).
 
 
 42
 The preceding quotation demonstrates that the Supreme Court in Rowley did not abdicate responsibility for monitoring the substantive quality of education under the EHA. Instead, it held that the education must "provide educational benefit." The Court thus recognized that the substantive, independent judicial review envisioned by the EHA was not a hollow gesture. Instead, courts must ensure "a basic floor of opportunity" that is defined by an individualized program that confers benefit.
 
 
 43
 Finally, it is important to note that, notwithstanding Rowley 's broad language, the Court indicated that its holding might not cover every case brought under the EHA. Indeed, Rowley was an avowedly narrow opinion that relied significantly on the fact that Amy Rowley progressed successfully from grade to grade in a "mainstreamed" classroom. The Court self-consciously limited its opinion to the facts before it:
 
 
 44
 We do not attempt today to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act. Because in this case we are presented with a handicapped child who is receiving substantial specialized instruction and related services, and who is performing above average in the regular classrooms of a public school system, we confine our analysis to that situation.
 
 Id. at 202, 102 S.Ct. at 3049.[12]
 
 45
 Although we do not argue that Rowley "contradicts itself," id. at 212, 102 S.Ct. at 3053 (White, J., dissenting), we nevertheless note the tension in the Rowley majority opinion between its emphasis on procedural protection (almost to the exclusion of substantive inquiry) and its substantive component quoted and discussed supra at 179.[13] This tension is unresolved in the Rowley case itself because the facts of the case (including Amy Rowley's quite substantial benefit from her education) did not force the Court to confront squarely the fact that Congress cared about the quality of special education. In the case sub judice, however, the question of how much benefit is sufficient to be "meaningful" is inescapable. Therefore we must examine the Act's notion of "benefit" and apply a standard that is faithful to congressional intent and consistent with Rowley.
 
 
 46
 B. EHA Requires More than a De Minimis Benefit
 
 
 47
 We hold that the EHA calls for more than a trivial educational benefit. That holding rests on the Act and its legislative history as well as interpretation of Rowley.
 
 1.
 
 48
 The opinion of the district court, anchored to the "some benefit" language of Rowley, 458 U.S. at 200, 102 S.Ct. at 3047, explained its holding as follows:
 
 
 49
 The fact that Christopher would advance more quickly with intensive therapy rather than the therapy he now receives does not make the School District's program for Christopher defective. Programs need only render some benefit; they need not maximize potential.... The Supreme Court has determined that the Act is primarily a procedural statute and does not impose a substantive duty on the state to provide a student with other than some educational benefits. Increased muscle tone may well fall outside of the scope of the requirement that Christopher receive some educational benefits from the program in which he is enrolled.
 
 
 50
 J.A. at 537-38 (citations omitted) (emphasis in original).
 
 
 51
 Plaintiffs argue on appeal that the district court applied the wrong standard in measuring the educational benefit of Christopher's program and that the case should be remanded for further proceedings consistent with the correct standard, one that requires more than a de minimis benefit. Defendants rejoin that Rowley 's announcement of a "some benefit" test precludes judicial inquiry into the substantive education conferred by the Act, so long as the handicapped child receives any benefit at all. Noting that Christopher's parents acknowledge that he derives some benefit from his education, defendants submit that the inquiry is over and that the district court's summary judgment must be affirmed.
 
 
 52
 Our review of the legal standard applied by the district court is plenary. See Muth, 839 F.2d at 120 (citing Universal Mineral, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir.1981); Wexler v. Westfield Bd. of Educ., 784 F.2d 176, 181 (3d Cir.), cert. denied, 479 U.S. 825, 107 S.Ct. 99, 93 L.Ed.2d 49 (1986).
 
 2.
 
 53
 Because Rowley is a narrow decision, our decision must perforce also be informed by the text of the EHA and the legislative history of the 1975 amendments. Accordingly, we turn to a discussion thereof. Our interpretation of "educational benefit" is informed by the text of the EHA and by the legislative history concerning the passage of the 1975 amendments. The self-defined purpose of the EHA is to provide "full educational opportunity to all handicapped children." 20 U.S.C. Sec. 1412(2)(A) (emphasis added). Similarly, the Senate Report on the 1975 amendments defined related services as "transportation, developmental, corrective, and supportive services (specifically including at least speech pathology and audiology, psychological services, counseling services, physical and occupational therapy, and recreation) necessary for a handicapped child to fully benefit from special education." Sen.R.No. 168, 94th Cong., 1st Sess. at 42 (emphasis added). The House Report echoes this language, citing the EHA's "goal of providing each handicapped child with a free, full, public education." H.Rep.No. 332, 94th Cong. at 11 (1975) (emphasis added). See also 121 Cong.Rec. 19482 (remarks of Senator Randolph, W. Virginia, Chair, Senate Subcommittee on the Handicapped) (discussing the goals of the EHA as "[a]chieving a goal of full educational opportunities"). Although the Supreme Court has instructed that Congress did not intend to provide optimal benefit, the Act's use of the phrase "full educational opportunity" and the EHA's legislative history indicate an intent to afford more than a trivial amount of educational benefit.
 
 
 54
 We note that the dissent in Rowley compiled a long list of statements made by Senators and Representatives sponsoring the 1975 amendments indicating that the purpose of the Act was to provide equal educational opportunity. See 458 U.S. at 213-14, 102 S.Ct. at 3054 (White, J., dissenting).[14] We do not reference this compendium for the broad proposition that the Act requires the states to maximize a handicapped child's education, as did the three dissenting Justices (Justices Brennan and Marshall joined in Justice White's dissent; Justice Blackmun wrote a separate opinion concurring in the majority opinion). Nevertheless, we may rely on these statements for the narrower proposition that the legislators who passed the EHA did not envision merely a trivial benefit to handicapped children.
 
 
 55
 Furthermore, we observe, as did the majority in Rowley, that a key concern of and primary justification for the EHA lay in the important goal of fostering self-sufficiency in handicapped children. See H.Rep.No. 332, 94th Cong., 1st Sess. at 11 (1975) ("taxpayers will spend many billions of dollars over the lifetime of these handicapped individuals simply to maintain such persons as dependents on welfare and often in institutions"); Rowley, 458 U.S. at 201 n. 23, 102 S.Ct. at 3048 n. 23 (quoting extensively from the legislative history of the EHA concerning self-sufficiency). The EHA's sponsors stressed the importance of teaching skills that would foster personal independence for two reasons. First, they advocated dignity for handicapped children. Second, they stressed the long-term financial savings of early education and assistance for handicapped children. A chief selling point of the Act was that although it is penny dear, it is pound wise--the expensive individualized assistance early in life, geared toward teaching basic life skills and self-sufficiency, eventually redounds to the benefit of the public fisc as these children grow to become productive citizens. See H.Rep.No. 332, supra, at 11 ("with proper educational services many of these handicapped children would be able to become productive citizens contributing to society instead of being left to remain burdens on society"); 121 Cong.Rec. 19492 (1975) (remarks of Senator Williams); id. at 19505 (remarks of Senator Beall).
 
 
 56
 Implicit in the legislative history's emphasis on self-sufficiency is the notion that states must provide some sort of meaningful education--more than mere access to the schoolhouse door. We acknowledge that self-sufficiency cannot serve as a substantive standard by which to measure the appropriateness of a child's education under the Act. See Rowley, 458 U.S. at 201 n. 23, 102 S.Ct. at 3048 n. 23. Indeed, Christopher Polk is not likely ever to attain this coveted status, no matter how excellent his educational program. Instead, we infer that the emphasis on self-sufficiency indicates in some respect the quantum of benefits the legislators anticipated: they must have envisioned that significant learning would transpire in the special education classroom--enough so that citizens who would otherwise become burdens on the state would be transformed into productive members of society. Therefore, the heavy emphasis in the legislative history on self-sufficiency as one goal of education, where possible, suggests that the "benefit" conferred by the EHA and interpreted by Rowley must be more than de minimis.
 
 
 57
 We believe that the teaching of Rowley is not to the contrary. As discussed above, the Rowley Court described the education that must be provided under the EHA as "meaningful." The use of the term "meaningful" indicates that the Court expected more than de minimis benefit. We note in this regard that the facts of Rowley clearly indicate that the "benefit" Amy was receiving from her educational program was substantial, and that "some benefit," in the case of Amy, meant a great deal more than a negligible amount.
 
 
 58
 However, to the extent that dicta in Rowley might be read to imply that courts should not become involved in the substantive aspects of the EHA, we find Rowley distinguishable from the case sub judice. As discussed in Section V(A), supra, Rowley specifically limited itself to the facts before it, involving a hearing-impaired child advancing from grade to grade in a "mainstreamed" classroom. Because the Court so self-consciously restricted the scope of its holding, we may (as we did above) reexamine the policies and the legislative history of the EHA to inform our decision.
 
 
 59
 Additionally, Rowley is distinguishable from the case sub judice because of the type of services requested. Unlike the services of a full-time interpreter (which arguably may be deemed extraordinary assistance), physical therapy, as discussed above in Sections I and III, is an integral part of what Congress intended by "appropriate education" as defined in EHA, and it is an essential part of Christopher's education. For example, physical therapy is cited as an example of the type of related services available under the Act. See 20 U.S.C. Sec. 1401(17). Moreover, federal regulations implementing EHA specifically define physical therapy as "services provided by a qualified physical therapist." 34 C.F.R. Sec. 300.13 (1987). Cf. T.G. v. Bd. of Educ. of Piscataway, 576 F.Supp. 420, 423-24 (D.N.J.1983) (distinguishing "extraordinary sign language services" of Rowley from psychological services that are specifically set out in EHA and regulations), aff'd, 738 F.2d 425 (3d Cir.), cert. denied, 469 U.S. 1086, 105 S.Ct. 592, 83 L.Ed.2d 701 (1984).
 
 
 60
 Finally, because of the severity of Christopher's disabilities and their qualitative difference from those of Amy Rowley, it is difficult to apply Rowley here. Christopher's progress cannot be measured by advancement in grade or acquisition of academic skill. His needs are drastically different, but no less important. See DeLeon v. Susquehanna Community School Dist., 747 F.2d 149, 153 (3d Cir.1984); see also Rowley, 458 U.S. at 202, 102 S.Ct. at 3049 ("It is clear that the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between."). Indeed, the needs of children like Christopher were paramount in the eyes of the EHA sponsors. The EHA provides that the most severely handicapped children be served first. See 20 U.S.C. Sec. 1412(3). That Christopher may never achieve the goals set in a traditional classroom does not undermine the fact that his brand of education (training in basic life skills) is an essential part of EHA's mandate. Therefore, although we believe the holding in Rowley is compatible with our holding in this case, to the extent that dicta in the opinion tend to undermine our substantive standard, we find the Rowley case distinguishable.
 
 3.
 
 61
 This court recently has had occasion to interpret and apply the Rowley standard in the context of a severely impaired child. In Board of Education v. Diamond, 808 F.2d 987, 991 (3d Cir.1986), we expressly rejected the argument that when the Supreme Court in Rowley referred to "some benefit," it meant any benefit at all, even if the child nevertheless regressed. The case involved a child, Andrew Diamond, with severe physical, neurological, and emotional handicaps. Despite evidence that Andrew's learning skills were deteriorating and his behavior was becoming counterproductive, the state resisted transferring Andrew from his placement in a day program to a placement in a residential program. As a result, Andrew's parents put him in a residential program and paid for it themselves.
 
 
 62
 After a due process hearing, the school board was ordered to place Andrew in an appropriate residential setting. The school board filed an action in federal court seeking a day placement for Andrew. The district court, however, endorsed the residential placement and ordered the school district to reimburse Andrew's parents for the expenses incurred when paying for his residential placement themselves.
 
 
 63
 In Diamond, we thus confronted and rejected the very argument that the defendants make here:
 
 
 64
 The School District's legal argument is that it is obliged by governing law to provide no more for Andrew Diamond than will be "of benefit" to him. The governing law, however, clearly imposes a higher standard.
 
 
 65
 Id. at 991. After observing that "the Rowley standard of enabling one to achieve passing marks and advance from grade to grade probably is not achievable for Andrew," id., the court observed:
 
 
 66
 But Rowley makes it perfectly clear that the Act requires a plan of instruction under which educational progress is likely. The School District's "of benefit" test is offered in defense of an educational plan under which educational regression actually occurred. Literally the School Board's plan might be conceived as conferring some benefit to Andrew in that less regression might occur under it than if Andrew Diamond had simply been left to vegetate. The Act, however, requires a plan likely to produce progress, not regression or trivial educational advancement.
 
 
 67
 Id. (emphasis in original). The teaching of Diamond is that, when the Supreme Court said "some benefit" in Rowley, it did not mean "some" as opposed to "none." Rather, "some" connotes an amount of benefit greater than mere trivial advancement.[15]
 
 
 68
 Defendants seek to distinguish Diamond, arguing that Diamond was a more egregious case, whereby regression had occurred under the state's educational plan (there has been no regression here). Although we acknowledge that this distinction has some force, and that Diamond does indeed stand for the proposition that a child who is regressing (and whose regression can be reversed by reasonable means) is not receiving sufficient "benefit" under the Act, we believe that Diamond can and should be read more expansively.
 
 
 69
 Indeed, defendants' distinction of Diamond, if carried to its logical conclusion, would arguably render that case more expansive because progress for some severely handicapped children may require optimal benefit. As we noted in Battle, 629 F.2d at 269, severely handicapped children (unlike normal children) have a strong tendency to regress. A program calculated to lead to non-regression might actually, in the case of severely handicapped children, impose a greater burden on the state than one that requires a program designed to lead to more than trivial progress. The educational progress of a handicapped child (whether in life skills or in a more sophisticated program) can be understood as a continuum where the point of regression versus progress is less relevant than the conferral of benefit. We note that it is therefore possible to construe Diamond 's holding not solely as an issue of progress or regression but also as requiring that any educational benefit be more than de minimis.
 
 
 70
 Furthermore, serious problem with defendants' attempted distinction of Diamond lies in defendants' implicit suggestion that a child must first show regression before his parents may challenge the appropriateness of his education. But we do not believe that Congress intended that courts present parents with the Hobson's choice of allowing regression (hence proving their claim) or providing on their own what their child needs to make meaningful progress. Finally, to the extent that defendants may correctly argue that the central focus of Diamond is regression, and that any language concerning "trivial benefit" is dicta, for the reasons set forth above, we find that dicta to be absolutely correct and in line with our analysis of Rowley and the legislative history of the EHA.
 
 4.
 
 71
 To summarize, in our view, the danger of the district court's formulation is that under its reading of Rowley the conferral of any benefit, no matter how small, could qualify as "appropriate education" under the EHA. Under the district court's approach, carried to its logical extreme, Christopher Polk would be entitled to no physical therapy because his occupational therapy offers him "some benefit."[16] We do not believe that such a formulation reflects congressional intent in light of the importance of related services (particularly physical therapy) in the statutory and regulatory scheme. Just as Congress did not write a blank check, neither did it anticipate that states would engage in the idle gesture of providing special education designed to confer only trivial benefit. Put differently, and using Rowley 's own terminology, we hold that Congress intended to afford children with special needs an education that would confer meaningful benefit.
 
 
 72
 We further conclude that Rowley, although it prescribes restraint and warns that Congress did not intend the Act to maximize a child's potential, does not militate against the standard we have announced. Because the test employed by the district court ostensibly could have allowed only a de minimis benefit, we must remand in light of our interpretation. Finally, we do not read the Supreme Court's salutary warnings against interference with educational methodology as an invitation to abdicate our obligation to enforce the statutory provisions that ensure a free and appropriate education to Christopher. See Georgia Ass'n of Retarded Persons, 716 F.2d at 1569 (noting the "central role states play in educating their citizens" but observing that "a state's responsibility for providing education is bounded by certain congressionally developed concerns once the state accepts federal financial assistance under the Act").
 
 
 73
 Obviously, this court is in no position to determine the factual question whether the treatment the defendants currently provide for Christopher is appropriate. We are, however, obligated to correct errors of law on appeal, and we hold that the district court applied the wrong standard in granting summary judgment for defendants when it allowed for the possibility of only de minimis benefit.
 
 
 74
 C. Under the Correct Standard Must Summary Judgment
 
 
 75
 Nevertheless be Affirmed?
 
 
 76
 Although defendants acknowledge that direct hands-on therapy would be beneficial to Christopher, they argue it is not essential to the conferral of an appropriate education. Defendants submit that "in view of Christopher's exceptionality, ... Christopher's progress has been outstanding." Br. of School Dist. at 8. The defendants presented testimony from the licensed physical therapist who consults with Christopher's teachers that indicates that he is progressing as quickly as can be expected given his multiple handicaps, and that the consultative model serves his needs.
 
 
 77
 Plaintiffs, by virtue of the evidence they adduced concerning Christopher's remarkable improvements in a short period of time at Shriner's, have provided at least some indication that his education may be inappropriate. See supra n. 4 (outlining Christopher's dramatic improvements achieved at Shriner's). Furthermore, they claim that Christopher has been working on some of the same skills for years, and that even accounting for his exceptionalities, his progress has been de minimis. For instance, there is a factual dispute among the parties concerning Christopher's progress in self-dressing and self-feeding. Plaintiffs contend that significant improvements in these areas attributable to the program at Shriner's and the direct physical therapy Christopher receives at home contrast markedly with the trivial advancement in fine and gross motor control that Christopher experienced as a result of seven years of public education under the consultative model.
 
 
 78
 Two private therapists who worked with Christopher at the Shriner's Hospital in Philadelphia in July 1985 each testified that Christopher needs direct physical and occupational therapy in his school by licensed and trained professionals. As their attorney explained at oral argument, the plaintiffs contend that the physical therapy provided by Christopher's teacher is akin to a sophisticated gym class, where Christopher practices bouncing a ball and other physical activities. They assert that such guidance, though helpful to Christopher, cannot substitute for direct physical therapy by a licensed physical therapist, which involves professional monitoring of discrete muscle behavior and frequent adjustments in response to improvement by the student.
 
 
 79
 Most important to plaintiffs are their contentions that Christopher cannot improve muscle tone without the assistance of a licensed physical therapist and that the state has ignored whole categories of need. See supra at 184. They adduced testimony in support of their assertion that a teacher and a teacher's aide are not qualified to deliver certain essential services and that Christopher's IEP contains goals requiring the direct attention of licensed physical therapists beyond the capacity of the consultative model. See J.A. at 327-31 (to prepare a child for gross motor tasks, a physical therapist must first normalize muscle tone and breakdown the goals into a task analysis; evaluation of muscle tone requires a knowledge of neurophysiology).
 
 
 80
 We recognize the difficulty of measuring levels of benefit in severely handicapped children. Obviously, the question whether benefit is de minimis must be gauged in relation to the child's potential. However, we believe that the extent of the factual dispute concerning the level of benefit Christopher received from his educational program precludes summary judgment under the standard that we announce today. The judgment of the district court will therefore be reversed and the case remanded for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable Daniel H. Huyett, 3rd, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The parties seem to use the words "consultive," "consultative," and "consultation" interchangeably. We will use the term "consultative" in describing the services defendants currently provide
 
 
 [2]
 The defendants provide the following definition of consultative therapy:
 In the consultation model, the therapist interacts with the classroom teacher and/or other educators who deal with the child on a regular and consistent basis and who are ultimately responsible for the child's educational performance. The therapist as a consultant increases the teacher's awareness of a handicapped child's need. The therapist instructs the teacher on appropriate methods and strategies to attain both physical therapy/occupational therapy goals and enhance the child's ability to benefit from classroom educational experiences.
 J.A. at 442. The district court made the following findings of fact:
 Under the Consultative Model no direct hands-on therapy is given to Christopher by licensed therapists. Instead, licensed therapists develop a program which is implemented by the classroom teacher and aide and the only contact the licensed therapists have with Christopher is a monthly monitoring of the delivery of the services by the classroom teacher and aide.
 J.A. at 532.
 
 
 [3]
 The parties engage in a semantic debate concerning the word "direct." Defendants argue that, because the physical therapists provide their consultative services "directly" to Christopher, it is incorrect to claim that he receives no direct physical therapy. For clarity's sake we will distinguish assistance provided by a licensed physical therapist via the consultative method from direct "hands-on" physical therapy treatment provided to Christopher by a licensed physical therapist
 
 
 [4]
 Mrs. Polk testified that after Christopher's 13-day intensive experience in Shriner's he was much better able to feed himself; that his weight bearing, control over his body, and use of a walker were improved; and that he began kneeling on his own
 
 
 [5]
 The hearing officer had found that Christopher was "benefiting from the special program of education being provided for him by the district and that he is progressing toward the goals and objectives set forth in his IEP." J.A. at 26. But as required by law the district court reviewed the facts independently. See 20 U.S.C. Sec. 1415(e)(2); Rowley, 458 U.S. at 206, 102 S.Ct. at 3050
 
 
 [6]
 This court recently held that the participation of the Pennsylvania Secretary of Education in this type of hearing process violated due process under the EHA because the Secretary of Education is a state employee (at least for the purposes of the EHA) and therefore cannot provide the "independent decision" based on an "impartial review" required by the EHA, 20 U.S.C. Sec. 1415 (1982). See Muth v. Central Bucks School Dist., 839 F.2d 113, 118, 120-126 (3d Cir.1988). Because the question is not before us, we do not rely on such deficiency in the procedural scheme in our decision
 
 
 [7]
 Defendants claim that this procedural argument was not raised in the district court. Although we acknowledge that the references to the procedural argument were obscure, we disagree. Count ten of plaintiffs' complaint charges that: "not one of such students [in the Unit] received the delivery of either service directly from a licensed occupational or physical therapist but rather was afforded the related service through the consultive model." J.A. at 526. Then, in point 4 of plaintiffs' motion for taking of additional testimony, pursuant to 20 U.S.C. Sec. 1415(e)(2) (allowing plaintiffs to present new evidence), plaintiffs set out their procedural theory of the case: "The Plaintiff contends that the application of the consultive model to all handicapped children deprives Christopher Polk of a unique educational program as required by the Education for the Handicapped Act." J.A. at 522. Additionally, in rejecting the defendants' 12(f) motion to strike, the district court took note of the plaintiffs' theory observing "that Paragraphs 9 and 10 set forth the factual basis for the assertion that not only is Christopher Polk's program not appropriate, but it is not individualized." J.A. at 527. Finally, Plaintiffs' Brief Contra Defendants' Motion for Summary Judgment, Polk v. Central Susquehanna Intermediate Unit, Civ. No. 86-1784 at 23, argued that summary judgment should be denied "because as a matter of law Christopher Polk's Individualized Educational Program is inherently not unique."
 
 
 [8]
 Physical therapy is essential for a child like Christopher because, in order to learn basic skills, he must learn to use his muscles properly. A key function of physical therapy is to normalize tonic reflex patterns. For example, abnormal muscle tone is a distinguishing characteristic of cerebral palsy and related problems. See Physical Therapy, supra, at 76. Whereas low muscle tone is too flaccid to fix posture; high muscle tone interferes with mobility. Id. at 357. See infra Section V(C)
 
 
 [9]
 Furthermore, plaintiffs assert that certain important goals for Christopher's education have been forsaken because those goals, such as increased muscle tone, are only attainable through direct physical therapy. As we see it, this argument goes more to the plaintiff's substantive than to their procedural claim. See infra Section V(C)
 
 
 [10]
 We note that in Georgia Association the Court of Appeals for the Eleventh Circuit, speaking through Judge Tuttle, refused to disturb a district court's finding that a local school district limited special education to a 180-day school year, even though defendants denied having such a policy. 716 F.2d at 1573-74
 
 
 [11]
 At various points, the Court reiterated its holding that "the Act imposes no clear obligation upon recipient States beyond the requirement that handicapped children receive some form of specialized education...." Rowley, 458 U.S. at 195, 102 S.Ct. at 3045, accord id. at 203, 102 S.Ct. at 3049 ("Insofar as a State is required to provide a handicapped child with a 'free appropriate public education' we hold that it satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.")
 
 
 [12]
 Indeed, in a footnote, the Court observed that the fact that a child was advancing from grade to grade would not necessarily suffice in every case to assure that the education would be deemed appropriate. Rowley, 458 U.S. at 203 n. 25, 102 S.Ct. at 3049 n. 25
 
 
 [13]
 The Rowley dissenters argued that the EHA was designed to maximize the educational benefit of handicapped children and that Amy Rowley could not achieve equal educational opportunity without a full-time interpreter in her classroom
 
 
 [14]
 Indeed, the House Report to the 1975 Amendments explained that a "fundamental tenet[ ]" of the Act is that "each child requires an educational plan that is tailored to achieve his or her maximum potential." H.Rep.No. 332, 94th Cong. at 13 (1975)
 
 
 [15]
 In Wexler v. Westfield Bd. of Educ., 784 F.2d 176 (3d Cir.) cert. denied, 479 U.S. 825, 107 S.Ct. 99, 93 L.Ed.2d 49 (1986), the court rejected the reimbursement claim of parents of a neurologically impaired child. The parents unilaterally chose private placement instead of the educational program devised by the state. In concluding that the district court had correctly applied the legal standard derived from Rowley, the court inquired whether the special education was " 'reasonably calculated to enable the child to receive educational benefits.' " 784 F.2d at 181 (quoting Rowley, 458 U.S. at 207, 102 S.Ct. at 3051). However, the court's discussion was brief. The opinion provides no detail concerning the nature of the state's program or the differences between that program and the program that the parents requested, and the court did not elaborate upon the standard, or address the possibility of de minimis benefit. We are therefore unable to draw significant instruction from this case
 
 
 [16]
 According to the district court's approach, major areas of need (such as normalized muscle tone) could be omitted entirely from coverage. See supra at 180 (quoting district court's opinion)