Christoph REUSCH, et al., Plaintiffs,

v.

Dr. Hiawatha FOUNTAIN,
et al., Defendants.

Civ. A. No. MJG–91–3124.

United States District Court,
D. Maryland.

Aug. 25, 1994.

Maureen O'Connell, Steven Ney, MD Disability Law Center, Inc., Landover, MD, for plaintiffs.

David C. Hjortsberg, Reese and Carney, Columbia, MD, Zvi Greismann, Sr. Atty., Montgomery County Public Schools, Rockville, MD, for defendants.

GARBIS, District Judge.

This case was tried before the Court without a jury. The Court, having heard the evidence, reviewed the exhibits and considered the legal memoranda submitted by the parties, issues this Memorandum Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

In this case, a group of disabled children residing in Montgomery County, Maryland, claim that Montgomery County Public Schools ("MCPS") has systematically failed to meet its obligation to provide them with an opportunity to obtain extended school year services ("ESY") in violation of the Individuals with Disabilities Education Act (the "IDEA" or "Act"), 20 U.S.C. §§ 1400–1485 (1990 & Supp.1994), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Supp. 1994). MCPS disputes that contention, claiming that the standards and procedures it has established satisfy all statutory requirements and that the Plaintiffs seek benefits in excess of those to which they are entitled.

## I. INTRODUCTION

It is the purpose of the Individuals with Disabilities Education Act:

> to assure that all children with disabilities have available to them ... a free appropriate public education ["FAPE"] which emphasizes special education and related services designed to meet their unique needs.

20 U.S.C. § 1400(c) (Supp.1994).

In carrying out this purpose, it is essential that an Individualized Education Program ("IEP") be developed for each disabled child. The development of each IEP requires consideration of the disabled child's unique needs for special education and any related services.

One of the issues that must be considered, and included in a disabled child's IEP when appropriate, is an extended school year program. The provision of ESY as part of an IEP is not simply the extension of time in school. Rather, it is the inclusion of extended services designed for the particular child as part of that child's *individualized* education program. There is no requirement that ESY be made a part of every disabled child's IEP even if there would be some educational benefit. Indeed, it appears that ESY would appropriately be part of an

FAPE for a relatively small number of disabled children. Nevertheless, while there is no requirement that all disabled children have ESY in their IEP, there is a legal obligation to consider and fairly evaluate the appropriateness of ESY in developing every IEP for every disabled child.

As discussed in detail herein, Defendant MCPS[1] has not complied with the IDEA in regard to ESY. Instead, MCPS has acted affirmatively to avoid its legal obligations to consider, and when appropriate, provide ESY to disabled children.

Parents of disabled children are given inadequate notice of their children's ESY rights. MCPS has created obstacles to parents and/or teachers who wish to advocate for ESY for a particular disabled child. MCPS has established procedures that cause excessive delays and a negative bias in the process of deciding upon ESY for a disabled child. And, in addition to its procedural shortcomings, MCPS also applies an overly restrictive standard in determining whether ESY should be a part of a disabled child's IEP. Furthermore, even in those all too few cases in which MCPS provides ESY, it still fails to comply with the IDEA's requirement that the ESY be part of an *individualized* educational plan and arranged in the least restrictive environment that is practical.

The disabled children of Montgomery County, Maryland, are entitled to speedy and effective relief. MCPS must now, after years of avoidance of its responsibilities, give disabled students their full measure of rights under the IDEA, including rights regarding ESY. The MCPS procedures, substantive bases of decision, and the design of IEPs including ESY when appropriate must, and shall, be in compliance with the Individuals with Disabilities Education Act.

## II. LEGAL SETTING

### A. In General

The Individuals with Disabilities Education Act,[2] 20 U.S.C. §§ 1400–1485 (1990 & Supp.1994)[3]:

---

1. The defendants in this suit—Dr. Hiawatha Fountain ("Fountain") and Dr. Paul Vance—are employees of MCPS, who are being sued in their official capacities. For convenience of reference, the defendants are referred to collectively as "MCPS."

2. Formerly named "The Education of the Handicapped Act".

3. Essentially identical requirements are imposed by the Rehabilitation Act, 29 U.S.C. § 794 (Supp.

provides federal money to assist state and local agencies in educating handicapped children, and conditions such funding upon a State's compliance with extensive goals and procedures.

*Hendrick Hudson Dist. Bd. of Educ. v. Rowley,* 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982).

The IDEA and its implementing regulations[4] guarantee all disabled children in states (such as Maryland) receiving IDEA funds the right to a free appropriate public education. 20 U.S.C. § 1400(c) (Supp.1994). All such states must enact legislation to ensure that right. If those state statutes establish broader or more specific entitlements than those expressly granted in the federal laws, the state entitlements are deemed to be incorporated into the federal right to a FAPE. *See Burke County Bd. of Educ. v. Denton,* 895 F.2d 973, 982–83 (4th Cir.1990); *Johnson v. Independent Sch. Dist. No. 4,* 921 F.2d 1022, 1029 (10th Cir.1990), *cert. denied,* 500 U.S. 905, 111 S.Ct. 1685, 114 L.Ed.2d 79 (1991); *David D. v. Dartmouth Sch. Comm.,* 775 F.2d 411, 417 (1st Cir.1985) ("It would seem beyond cavil that the federal standard explicitly incorporates some of a state's substantive law into the federal Act."), *cert. denied,* 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986).

Maryland receives IDEA funds and has enacted enabling legislation. *See* Md.Code Ann., Educ. §§ 8–401 to –417.6 (1992), and its implementing regulations, COMAR § 13A.05.01.

### B. *Standard For IDEA Compliance*

In the landmark *Rowley* case, the Supreme Court established a two-part test for determining whether the requirements of the IDEA have been met:

First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program

developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?

458 U.S. at 206–07, 102 S.Ct. at 3051.

■ Stressing the importance of the procedural aspects of the IDEA, the Court noted: "It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process ... as it did upon the measurement of the resulting IEP against a substantive standard." *Id.* at 205–06, 102 S.Ct. at 3050. Moreover, the United States Court of Appeals for the Fourth Circuit has stated that "[u]nder *Rowley,* ... failures to meet the Act's procedural requirements are adequate grounds by themselves for holding that the school failed to provide [a disabled student] a FAPE." *Hall v. Vance County Bd. of Educ.,* 774 F.2d 629, 635 (4th Cir.1985); *see also Board of Educ. v. Dienelt,* 843 F.2d 813, 815 (4th Cir.1988).

■ With regard to the substantive component of the *Rowley* test, federal appellate courts have warned that the "some educational benefit" prong will not be met by the provision of *de minimis,* trivial learning opportunities.[5] *See Hall,* 774 F.2d at 636; *Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 180–84 (3rd Cir.1988) (holding "that Congress intended to afford children with special needs an education that would confer meaningful benefits"), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989). Nor can the sufficiency of the educational benefits offered be measured by any single, narrow standard. *See Hall,* 774 F.2d at 635; 20 U.S.C. § 1412(5) (Supp.1994) ("[N]o single procedure shall be the sole criterion for determining an appropriate educational program for a child.").

### C. *The Individualized Education Program ("IEP")*

The "centerpiece of the [IDEA]'s education delivery system for disabled children" is the

---

1994). Therefore, the Rehabilitation Act is not separately discussed herein.

**4.** 34 C.F.R. §§ 300.1–300.754.

**5.** The IDEA, however, does not require that IEPs be designed to maximize each child's potential. *Rowley,* 458 U.S. at 198, 102 S.Ct. at 3046–47.

individualized education program.[6] 20 U.S.C. § 1401(a)(20). The IEP establishes the means by which the educational plan for each disabled child is to be developed. As the Third Circuit noted in *Polk*, "The system of procedural protections only works if the state devises an *individualized* program and is willing to address the handicapped child's 'unique needs.'" *Polk*, 853 F.2d at 177. *See also Johnson*, 921 F.2d at 1027 ("The individualization requirement is of paramount importance in the Act."); 20 U.S.C. § 1401(a)(20) (Supp.1994). Each child's IEP must be reviewed, and updated if necessary, at least annually. 34 C.F.R. § 300.343(d).

■ The IDEA requires that schools fully involve parents in the formulation, review, and revision of their child's IEP. As stated by the Court in *Rowley:*

> Congress sought to protect individual children by providing for parental involvement in the development of state plans and policies ... and in the formulation of the child's individual education program.

458 U.S. at 208, 102 S.Ct. at 3052. The federal regulations state that "parents of a child with a disability are expected to be equal participants along with school personnel, in developing, reviewing, and revising the child's IEP." 34 C.F.R. § 300 app. C, ¶ 26.

The Fourth Circuit consistently has found this obligation to be a critical one. In *Hall*, the Fourth Circuit stressed "the importance of the Act's provisions ensuring *meaningful* parental participation in formulating and implementing a child's IEP." 774 F.2d at 634 (emphasis added). In *Dienelt*, the same court ruled that the school board "utterly failed to determine the special educational needs of [the child] or to provide him with an adequate IEP" primarily because the board failed to "adequately involve the parents in the preparation of [their child's] IEP." 843 F.2d at 815.

■ All school placements must be based on the IEP and the Act's least-restrictive-environment provision ("LRE"),[7] reinforcing the IDEA's mandate of an individualized approach to the education of disabled children. *See* 34 C.F.R. § 300.552; COMAR § 13A.05.01.08(E)(2)(b). De-individualized placements expressly violate the regulations and impact negatively on parental rights. In *Spielberg v. Henrico County Pub. Sch.*, 853 F.2d 256 (4th Cir.1988), *cert. denied*, 489 U.S. 1016, 109 S.Ct. 1131, 103 L.Ed.2d 192 (1989), the Fourth Circuit held that after-the-fact IEPs—IEPs developed retrospectively to fit an already made placement decision—violate the IDEA, explaining that:

> Under the [IDEA], the general rule is that placement should be based on the IEP. 34 C.F.R. § 300.552.... The decision to place [the child] at [a particular school] before developing an IEP on which to base that placement violates this regulation as interpreted by the Secretary of Education. It also violates the spirit and intent of the [IDEA], which emphasizes parental involvement.

*Id.* at 259.

■ The development of the IEP also triggers the "extensive due process requirements" imposed by the IDEA. *Polk*, 853 F.2d at 173. *See also Johnson*, 921 F.2d at 1026–27; *Cordrey v. Euckert*, 917 F.2d 1460, 1464 (6th Cir.1990), *cert. denied*, 499 U.S. 938, 111 S.Ct. 1391, 113 L.Ed.2d 447 (1991); *Hall*, 774 F.2d at 634. The specificity of the timing requirements in the IDEA, the Maryland Code, and the relevant regulations for the review and appeal of IEP conflicts demonstrate the direct connection between timely decision-making and the provision of a FAPE itself. *See, e.g.*, 20 U.S.C. § 1415 (1990 & Supp.1994); Md.Code Ann., Educ. § 8–415 (1992); 34 C.F.R. §§ 300.343(c), 300.512; COMAR §§ 13A.05.01.14, .15. Systematic or unreasonable delays in the formulation and implementation of IEPs violate the Act. *See Tice v. Botetourt County Sch. Bd.*,

---

**6.** *See Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 597–98, 98 L.Ed.2d 686 (1988).

**7.** The IDEA requires that schools take steps to ensure "[t]hat to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled." 34 C.F.R. § 300.550(b)(1). *See also* 20 U.S.C. § 1412(5)(B) (Supp.1994); COMAR § 13A.05.01.10(B).

908 F.2d 1200, 1207 (4th Cir.1990); *Evans v. Evans,* 818 F.Supp. 1215, 1222 (N.D.Ind. 1993).

### D. *Notice to Parents Regarding IEP Reviews*

▇ The IDEA requires that school boards provide parents with advance written notice of all available procedures when they propose to review a child's IEP. 20 U.S.C. § 1415(b) (1990); COMAR § 13A.05.01.13(C)(1). This notice must include a "full explanation" of all procedural safeguards, 34 C.F.R. § 300.505(a), so that it "fully informs" parents of all of their procedural rights and opportunities. 20 U.S.C. § 1415(b)(1)(D). In addition, the IDEA requires that the notice be "[w]ritten in language understandable to the general public." 34 C.F.R. § 300.505(b). The Fourth Circuit emphasized the significance of appropriate notice when it stated:

> Unless school systems apprise parents of their procedural protections, however, parental participation will rarely amount to anything more than parental acquiescence, because parents will presume they have no real say, and the participatory function envisioned by *Rowley* will go unfulfilled.

*Hall,* 774 F.2d at 634.

In notifying parents of an upcoming IEP meeting, schools "must indicate the purpose, time, and location of the meeting and who will be in attendance." 34 C.F.R. § 300.345. Moreover, in Maryland, school systems must have "procedures for making and documenting reasonable efforts to inform parents of and involve them in the special education decision-making process." COMAR § 13A.05.01.08(F)(3).[8]

### E. *Extended School Year Services ("ESY") in a Free Appropriate Public Education*

▇ Neither federal nor Maryland law require that every disabled child receive extended school year services as part of the child's IEP. However, those laws do require that ESY be available in those cases in which it is deemed to be a part of a particular child's free appropriate public education.

In *Johnson, supra,* the United States Court of Appeals for the Tenth Circuit summarized the findings of a number of circuits, reiterating that "under the Act itself, states must provide a continuous educational experience through the summer under the child's IEP if that is the 'appropriate' educational experience for the handicapped child's situation." 921 F.2d at 1030. In the landmark ESY decision of *Battle v. Pennsylvania,* 629 F.2d 269 (3rd Cir.1980), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981), the Third Circuit concluded that "inflexible application of a 180 day maximum prevents the proper formulation of appropriate educational goals for individual members of the plaintiff class [of disabled children]." *Id.* at 281. *See also Cordrey,* 917 F.2d at 1473 (6th Cir.); *Georgia Ass'n of Retarded Citizens v. McDaniel,* 716 F.2d 1565, 1576–77 (11th Cir.1983), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 365 (1985); *Crawford v. Pittman,* 708 F.2d 1028, 1034–35 (5th Cir.1983). Moreover, when ESY is appropriate, the Office of Special Education Programs has determined that least restrictive environment ("LRE") requirements apply. EHA Ruling/Policy Letter, 213 IDEALR 255 (July 19, 1989).

▇ ESY is expressly addressed in the Maryland legislation, which becomes in essence part of the federal law for Maryland's disabled children. Indeed, the section of the Maryland Code that sets forth the general duties of the State and counties in this area contains only two directives; one is that free educational programs be made available to all disabled students, the other is that parents be notified of the availability of ESY. Md.Code Ann., Educ. § 8–402 (1992). The

---

8. "Reasonable efforts" is a defined term under the Maryland regulations, including the following obligations:

  (i) giving timely notice to parents of meetings; (ii) scheduling meetings at a mutually agreed upon time and place; (iii) fully explaining to the parents their rights in the special education

decision-making process; (iv) providing to parents written information on placement procedures and due process rights; and (v) arranging for interpreters for the parent who is deaf or whose native language is other than English.

COMAR § 13A.05.01.02(B)(7)(a).

Maryland regulations further this emphasis by including a decision on ESY as one of the four determinations expressly required at every annual IEP review.[9] COMAR § 13A.05.01.09(G)(1)(d). Admission, Review, and Dismissal ("ARD") Committees—the committees that develop and review IEPs in Maryland—are specifically charged with ensuring that parents are aware of two things: Maryland's graduation requirements and the availability of ESY. COMAR § 13A.05.01.08(E)(4). Furthermore, Maryland regulations expressly require that ESY "be provided pursuant to a properly developed [IEP] as soon as possible, and in accordance with [LRE] requirements...." COMAR § 13A.05.01.09(G)(3).[10] Under the *David D.* line of authority, *supra,* Maryland's ESY provisions are incorporated into the federal right.

## III. BACKGROUND TO THIS DISPUTE

### A. MCPS Hostility to Providing ESY

Despite MCPS's awareness since 1979 of its obligation to provide ESY to deserving students, it failed to provide any such services to public school students for at least the next ten years. The hostile attitude of MCPS toward ESY is illustrated by a July 27, 1979, memorandum written by Defendant Fountain (then Associate Superintendent for Continuum Education). In the memo, he noted the "hard line" Maryland had taken on the 180–day school year, detailed the problems he foresaw with any requirement that MCPS make ESY generally available, and advocated that "an appeal [be] filed and the ruling reversed" in *Armstrong v. Kline,* 476 F.Supp. 583 (E.D.Pa.1979), the case that first established ESY as a right under the IDEA.

The Court finds that MCPS's disinclination to provide ESY as part of a FAPE has continued to this date. As admitted by the principal of Longview School (where children with severe and profound mental retardation are taught) "our students somewhat systematically have not been recommended for [ESY]," but rather have been encouraged to enroll in summer enrichment programs. These summer enrichment programs are neither IEP-based nor free. Moreover, a January 1993 memo from Fountain to county principals, containing the special education annual review procedures for that year, downplayed ESY in two dramatic ways. First, the "Sample Annual Review ARD Agenda" omitted any reference to ESY as a topic of discussion. Second, the procedures promote the avoidance of any ESY discussion at the school-based IEP meeting under the following directive:

> Should parents have questions about [ESY] programming during the meeting, continue with decisions about the 93–94 program and refer summer program discussion to the field office supervisor/assistant supervisor of special education and pupil services.

(Fountain memo dated Jan. 15, 1993, Pl.'s Ex. 18.) Thus, parents of disabled children found themselves forced to fight the school bureaucracy for ESY or, if they could afford the cost, send their child to a nonindividualized summer enrichment program for which fees were charged. As the Supreme Court has stated, "The Act was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives." *School Comm. of Burlington, Mass. v. Department of Educ.,* 471 U.S. 359, 372, 105 S.Ct. 1996, 2004, 85 L.Ed.2d 385 (1985). MCPS cannot meet its legal obligation to provide a disabled child free ESY when appropriate by steering parents to an alternative that is neither individualized nor free.

### B. Procedures in This Case

The present case commenced when two students filed due process appeals against MCPS for its failure to consider and/or acknowledge their eligibility for ESY. The state-level hearing review board ("HRB") ultimately sided with the students and issued written decisions. (*See* HRB Decisions dated

---

**9.** The other required determinations are whether the student has achieved his or her IEP goals, whether to modify the IEP, and whether LRE can be better achieved.

**10.** The regulations also set forth a standard for determining when ESY must be provided, *see* COMAR § 13A.05.01.09(G)(2), which will be discussed below.

May 10, 1989, May 24, 1989, and April 24, 1989, Pl.'s Ex. 53.) In the decisions, the HRB criticized MCPS for not having a written policy regarding ESY, for not having teachers present at IEP meetings, for using a single narrow criterion for determining ESY eligibility, and for not informing parents about ESY. The HRB recommended, *inter alia*, that MCPS "develop procedures which at least notify parents and teachers that they can initiate requests for ESY programs" and broaden the ESY standard to include factors other than regression and recoupment, mentioning emerging skills and the nature and severity of the handicapping condition as two relevant considerations.

Following the HRB decisions, MCPS developed interim guidelines regarding ESY. These, however, met with less than glowing reviews. In its comment letter, Montgomery County Association for Retarded Citizens continued to "see the regression/recoupment standard as too narrow." (Letter from Karasik to Fountain, dated Apr. 20, 1990, Pl.'s Ex. 51.) Even MCPS insiders found the standards flawed. Dr. Harry Pitt, then Superintendent of MCPS, found certain key language to be "very poorly worded [and] confusing." (Transcript of ESY Meeting, dated May 5, 1990, at 6, Pl.'s Ex. 50.) A member of the Board of Education stated his concerns more broadly:

> The difficulty with [how the guidelines are written] is that somebody who's neither a lawyer nor a professional in the field, but is perhaps a parent of a child who needs help, is going to take a look at this, and is going to say this is written so that I can't break the code; and if I have a view different than that of the school system, I can't win.

(*Id.* at 11 (comments of Ewing).)

The following year, in the very guidelines designed to ensure consideration of ESY, MCPS again directed its personnel to encourage disabled children away from ESY and toward its tuition-based enrichment programs. (*See* "Preparing for [ESY] Discussion at Annual Review, ¶ 2, Pl.'s Ex. 44.")

Plaintiffs filed suit in October 1991. By agreement, this case was certified as a class action with regard to the claims resolved herein.[11]

## IV. *PROCEDURAL CLAIMS*

### A. *Inadequate Notice of ESY*

In 1992, MCPS sent an "Invitation to Annual Review Meeting" letter to the parents of all disabled students, which set forth the time and place of the meeting, the expected attendees, and a detailed list of the issues to be discussed. The invitation also referenced an enclosed *"Due Process: Parents' Rights in Special Education Placement"* brochure, explaining parental rights in the process. (Df.'s Ex. 18, at B–9; Df.'s Ex. 11.) Of the four determinations to be made at every annual review under COMAR § 13A.05.01.09(G), three were mentioned in the letter as issues to be addressed—whether the student has achieved his IEP goals, whether the IEP need be modified, and whether a less restrictive environment can be found for the student. Conspicuous by its absence—in both the letter and the accompanying brochure—was any mention of whether ESY would be appropriate, the fourth determination specifically required under Maryland law.

The only notice of ESY that parents might have received from MCPS in 1992 was contained in the *"Elementary and Secondary Summer School Programs"* brochure distributed to all MCPS students. At the end of that brochure, in the section covering summer enrichment programs for disabled students (for which tuitions were charged), a parent could find two general paragraphs about ESY. This "notice" contained a brief description of the regression-based standard used by MCPS, the need to develop an ESY IEP, and a direction for "[p]eople who believe their children may qualify" to contact an area supervisor or the central placement office. (Pl.'s Ex. 20, at 7.) The brochure was not even sent out until mid-May, after many of the annual reviews had been held.

In 1993, MCPS sent out essentially the same materials with the same shortcomings,

---

11. The individual claims of the named Plaintiffs have been severed for separate trial.

except that the enclosed procedural rights brochure—now entitled *"Procedural Safe-guards—Parental Rights "*—was amended to include a single-paragraph regarding ESY. This stated:

> You are to be notified of the availability of extended school year services if necessary to meet the unique needs of an individual student with disabilities.

(Pl.'s Ex. 7, at 4.) No mention was made of any parental right to initiate a request for ESY for their child. Moreover, the "you are to be notified" passive voice of the quoted statement promoted the very evil targeted by the *Hall* court—presumed parental helplessness.

Such notice that MCPS provided to the parents of disabled children failed to inform them that ESY was required to be considered at each and every annual review meeting. *See* COMAR § 13A.05.01.09(G)(1). Rather, it suggested the opposite—that ESY would be addressed only in exceptional cases. Moreover, MCPS failed to inform parents that written guidelines were available. Nor did MCPS explain adequately the ESY process or that ESY eligibility for any individual student was evaluated in a complicated two-step process, requiring the approval of both a school-based Admission Review and Dismissal "ARD" committee (the "SARD") and the central ARD committee (the "CARD").

The notice required under federal law must contain "full explanation[s]" of IDEA procedures in plain language that "fully informs" parents of their rights. 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.505. Under Maryland regulations, schools must take "reasonable efforts" to keep the parents of disabled students informed and involved. As defined by those regulations, reasonable efforts include, *inter alia,* "fully explaining to the parents their rights in the special education decision-making process." *See* COMAR § 13A.05.01.02(B)(7).

MCPS has not provided notice reasonably calculated to fully explain ESY rights and procedures or to fully inform parents of disabled children of such rights and procedures.

To the contrary, MCPS has utilized such "notice" as was given to avoid its obligation to provide such services to deserving disabled students. This conduct violates the IDEA. The present case presents an apt confirmation of the Fourth Circuit's warning that "[u]nless school systems apprise parents of their procedural protections, ... parental participation will rarely amount to anything more than parental acquiescence, because parents will presume they have no real say...." *Hall,* 774 F.2d at 634.

The MCPS practice of inadequate and untimely ESY notice must cease. Notice of ESY designed to fully explain such services must be provided to parents of disabled children in a timely fashion before annual review meetings. The notice must not disguise or downplay the true nature of ESY or attempt to confuse parents between free extended year services and tuition-charging summer enrichment programs. MCPS must, consequently, also adjust and improve its personnel training to ensure that its staff is aware of all proper standards and procedures, as required by 34 C.F.R. § 300.382 and CO-MAR § 13A.05.01.04(H).

## B. *Problems with MCPS's Two–Step Process*

MCPS has implemented a unique [12] two-step process for its annual ESY eligibility determinations. At the first step—a School Admission, Review and Dismissal ("SARD") Committee—ESY may be either denied outright or referred for consideration to the second step—the Central Admissions, Review and Dismissal ("CARD") Committee. A SARD denial is final and will not be reconsidered by the CARD Committee unless a parent presses the issue. A SARD referral for ESY, however, is reevaluated at the CARD level. The CARD Committee has final authority to find students eligible for ESY and, consequently, it also determines the duration, location, and content of those services. Data regarding ESY eligibility for

12. The process is "unique" in that Montgomery County parents face such dual hurdles in no other area of special education.

particular students is to be collected on the local level.

The 1992 ESY guidelines set forth in detail the process by which ESY eligibility is determined. (Pl.'s Ex. 30.) A "Referral for Consideration of Extended School Year" form is attached to the guidelines that, when filled out by the SARD, triggers the CARD consideration of ESY and provides the CARD Committee with information about the student's educational progress and ESY eligibility. The 1993 guidelines, though essentially the same as the previous year, contained certain changes that undercut the teacher attendance requirement at CARD meetings, on one hand, but appeared to broaden the substantive standard for ESY, on the other. (Pl.'s Ex. 8.)

MCPS makes one exception to the two-step process. In response to requests from parents of children with autism for faster ESY decisions, those students undergo a one-step process wherein a CARD member attends the SARD meeting, which is then authorized to make final ESY decisions. The result has been earlier decisions for children with autism. (*See* Pl.'s Ex. 1, charts 17–20.) Under the guidelines, the Associate Superintendent for Special and Alternative Education could authorize other programs to make final ESY determinations at the SARD level.

Plaintiffs argue that the two-step process is an artificial stratagem preventing disabled children from receiving ESY by building delays into the system, frustrating meaningful parent and teacher participation at IEP meetings, de-individualizing ESY considerations, and hampering the collection of relevant and necessary supporting data. MCPS claims that the two-step process is necessary for administrative and efficiency reasons, noting that certain schools and buildings are unavailable and staffing is different during the summer.

There may be a legitimate function for a second level procedure for ESY determinations. However, any such function must be performed in a manner that does not serve the illegal purpose of adversely affecting the rights of disabled children. The present MCPS two-step ESY process violates the IDEA both in structure and in practice.

All IEPS must be developed by a properly constituted IEP committee, including:

> a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities.

20 U.S.C. § 1401(a)(20). It is readily apparent that the MCPS two-level structure undermines the viability of the SARD committees. An IEP committee not authorized to factor ESY into a student's overall educational program cannot be deemed a properly constituted IEP committee. First, it is not only the titles of the IEP committee members that makes a committee properly constituted; their attendant authority is essential as well. Second, different school-year IEPs may be expected depending on whether the child receives ESY, a condition SARD committees are unable to factor into their broader considerations to the detriment of the child's "appropriate" education.[13] Even if this Court were to accept the SARD committees as proper, however, the inherent delay and inconvenience of MCPS's second IEP meetings and the isolation of ESY apart from the rest of a student's program cannot be sanctioned under the Act.

In practice, the CARD Committee presents only the appearance of a review in ESY matters. In every case in which the SARD committee recommended against providing ESY the CARD committee unanimously affirmed. In every case in which there was a referral from the SARD for consideration of ESY, the CARD Committee acted unanimously. In view of the nature of the inherently debatable individualized decisions required with regard to ESY, the absence of a single dissenting vote in so many cases provides a strong indication that the CARD Committee members are not actually provid-

---

**13.** While IEPs may be updated as necessary, this Court does not understand MCPS to offer a sec-

ond SARD meeting after the CARD ESY decision.

ing a meaningful and individualized decision. As stated by the United States Court of Appeals for the Fifth Circuit (albeit in a different context):

> Statistics are not, of course, the whole answer, but nothing is as emphatic as zero.

*United States v. Hinds County Sch. Bd.*, 417 F.2d 852, 858 (5th Cir.1969), *cert. denied*, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970). The absence of real independent consideration or meaningful review at the CARD meeting supports the Court's conclusion that the two-step process for ESY decisions has functioned as a road block and must be terminated.

The Court further finds the two-step process to create problems regarding parent and teacher participation and timely and individualized decision-making guaranteed under the IDEA. It is required that parents and teachers most familiar with the disabled student are to be present at, and included in, all IEP discussions.[14] 34 C.F.R. §§ 300.344, .345; COMAR § 13A.05.01.09(B).

In the MCPS scheme, the extra CARD meeting creates scheduling conflicts and additional burdens and inconveniences that interfere with those rights. In particular, the centralized CARD meetings effectively prevent a large number of school-based teachers from being present at the ESY discussions of their students. (*See* Pl.'s Ex. 1, chart 15.) When dealing with a child's educational program, it is wholly inappropriate to erect barriers to the input of the child's teachers, who not only are charged with providing the very

special education services at issue but also best know that child in his or her educational setting.

As discussed above, timeliness and individualization are also pivotal to the IDEA's substantive and procedural rights. By centralizing ESY decisions, focusing on administrative concerns such as building closings, and reducing teacher input, MCPS has de-individualized students' IEPs in violation of the Act. In essence, Defendants committed the same error identified by the Fourth Circuit in *Spielberg*—putting the cart before the horse.[15] Nor can the IDEA be construed to permit schools to thwart parents' procedural rights of appeal by unduly delaying final IEP decisions. By requiring parents seeking ESY for their children to petition for and attend a second meeting, however, that is exactly what is happening. If, for reasons of efficiency and administrative necessity, MCPS desires to retain a centralized overseer of ESY programming, it must find a way to do so without violating the Act.

In their post-trial memorandum, Defendants state that "Plaintiffs' policy goals are to run the school system. They presented no testimony from anyone with any management expertise, but ignorantly propose to dismantle the CARD system without regard to the consequences to students who are entitled to have a well-managed system of providing ESY services." Defendants' rhetoric is unwarranted.[16] In any contest between systemic efficiency and the provision of a

---

**14.** The IDEA requires no rigid voting system in the IEP decision-making process. Consequently, MCPS is free to adopt—as it has—a policy of consensus-building at IEP meetings in which voting is discouraged. However, voting does occur in some cases. Plaintiffs argue that when IEP committees do vote on critical issues, parents and teachers should be included. MCPS denies that there is such a requirement under the IDEA.

Under federal and state regulations, parents and teachers are statutorily named members of IEP committees. *See* 34 C.F.R. § 300.344; COMAR § 13A.05.01.09(B). The provisions make no mention of any difference in status between them and the administration representative also required to attend such meetings. To the contrary, the regulations note that parents are to be treated as "equal participants" in the process. 34 C.F.R. § 300 app. C, ¶ 26. The Court is not going to require that parents and/or teachers be

given a vote in the decisional process. However, it will require that the position of non-voting parents and teachers be considered by those voting and placed in the record of the proceedings.

**15.** The Court is not holding that the IDEA prevents MCPS from addressing its very real administrative concerns. Rather, those concerns must be addressed in light of the educational services MCPS is obligated by the IDEA to provide.

**16.** Defendants' counsel have chosen to include in their briefs *ad hominem* attacks on Plaintiffs and their counsel peppered with acerbic quotes from such authors as Voltaire and H.L. Mencken. Presumably, counsel sought and failed to find more pertinent—albeit more prosaically written—quotations from legal authorities to support their arguments.

FAPE to a disabled child, Congress and the Supreme Court have made clear that the child must prevail. *Cf. Florence County Sch. Dist. Four v. Carter*, —— U.S.——, ——, 114 S.Ct. 361, 366, 126 L.Ed.2d 284 (1993).

The evidence establishes, moreover, that the MCPS two-step ESY process is not the benign engine of efficiency portrayed by Defendants. Rather, it is a device that in operation presents an effective obstacle to the right of a disabled child to receive ESY when appropriate. This obstacle must be eliminated.

#### C. *Late Decisions*

■ The present procedures of MCPS, including the two step process, have caused a violation of the IDEA due to delays in making ESY decisions. It is, simply put, unacceptable for MCPS to make decisions so late in the school year that the disabled child cannot exercise rights of review and/or be given the ESY to which that child was entitled.

Nearly 75% of all ESY decisions for the summer of 1992 were made after May 1, 1992. All denials of ESY occurred after that date and several occurred as late as June 23, 1992. (Pl.'s Ex. 1, charts 17, 18.) On at least one occasion, Defendants contemporaneously acknowledged that ESY decisions were being made too late in the school year. (*See* Memo from Fountain to Pitt, dated Mar. 13, 1991, Pl.'s Ex. 42.) At trial, however, Dr. Stanley Sirotkin, Supervisor of MCPS's Diagnostic Support Team, testified that he would not consider a decision to be too late until mid- to late-August. The Court could not disagree more with this remark.

Generally, matters of timing are left to the school board's discretion under 34 C.F.R. § 300.343. That discretion is abused, however, when decisions are delayed for illegitimate purposes—such as to deny parents the ability to exercise their due process rights guaranteed under other sections of the regulations. Timely decision-making is critical to the integrity of the rights granted under the IDEA. In particular, unduly late decisions infringe upon parents' rights to administrative review of IEP decisions within established timelines. *See* 34 C.F.R. § 300.506 (giving parents a right to a due process hearing); *id.* § 300.512 (setting a 45–day limit on the review process).

The Court concludes that MCPS has violated the IDEA by delaying many ESY decisions so long as to infringe the procedural rights of disabled students. The delays have, in effect, fostered the overall scheme of MCPS to minimize the availability of ESY to disabled children.

The precise steps that MCPS must take to avoid illegal delays in decision remain to be resolved. Plaintiffs argue that an April 15 deadline would be reasonable, as it would provide for a sixty-day window for administrative review before the end of the school year.[17] Defendants claim that such a deadline would de-individualize the decision process, prevent later, better-informed decisions, and deny MCPS the use of spring break for data gathering. To the extent that delays past April 15 are truly necessary for making an informed ESY decision for a given child, MCPS should be permitted to defer particular decisions. However, the deferral of decisions on a systematic basis must cease. Because of the academic year calendar, decisions must be made—on the best available data if complete information is not available—sufficiently early to preserve the ability of the child to pursue procedural rights of review. Disabled children can no longer have their right to obtain appropriate ESY during the summer recess blocked by MCPS delays in making decisions.

The Court notes that significant timing benefits will be achieved by the elimination of the present two-step process. Further, MCPS has demonstrated by its handling of the autism program that it is capable of making reasonably early decisions. Accordingly, the Court is confident that a workable and effective remedy for the decisional delay problem can be achieved.

---

17. Apparently, it may take extra time to trigger the due process timelines in Montgomery County because MCPS does not start time running until it receives a request for a hearing on an official MCPS form. The Court finds no support in any of the relevant statutes or regulations for tolling the due process timelines during an exchange of forms.

**D. *Failure to Address ESY At Approval Reviews***

█ Plaintiffs allege that MCPS has failed to address ESY at every annual review, as is required under COMAR § 13A.05.01.09(G). Defendants deny the allegation. The Court finds that the Defendants are flatly wrong. Not only was there a failure to comply with the express requirement that ESY be discussed, MCPS affirmatively sought to avoid such discussions.

MCPS's internal "Special Education Annual Review Process" packet for 1993 directs school personnel to refer parents raising ESY questions to officials involved in midlevel management, rather than to address the issue directly. (Pl.'s Ex. 18.) In that same packet, ESY is omitted from the detailed list of considerations to be addressed at IEP meetings found on the "Sample Annual Review ARD Agenda" form. No other integral educational component is excluded from that agenda. Under the 1992 ESY guidelines, MCPS pledged that ESY would "be discussed with parents at the annual review, *as necessary*." (Pl.'s Ex. 30 (emphasis added).) Because *discussion of ESY is always necessary* by virtue of state law, MCPS was guiding its staff away from the duty to discuss ESY in every annual meeting.

Maryland regulations require not only that ESY be addressed at every annual review, but also that a written summary of that review be available to the parents. COMAR § 13A.05.01.09(H). *See also id.* § 13A.05.01.08(F)(3) (requiring boards to "develop procedures for making *and documenting* reasonable efforts to inform parents of and involve them in the special education decision-making process"); 34 C.F.R. § 300.501. Under these provisions, MCPS is obligated to record in some accessible place and reasonable manner that ESY has been raised and discussed at each student's annual review meeting. Yet, in reviewing the sample files (provided by MCPS) of the most seriously disabled students, it appears that ESY was not discussed—or, at least, no such discussion was documented on the students' files—in more than 80% of the samples.

MCPS must meet its obligations to address ESY at all annual reviews and to create appropriate documentation. Therefore, MCPS must have in place a system whereby those conducting an annual review affirmatively confirm that ESY was addressed and record a summary of the ESY discussion.

## V. *PLAINTIFFS' SUBSTANTIVE CLAIMS*

### A. *The Appropriate Standard*

█ In general, for there to be an obligation to provide ESY in a given case, it must appear "that an ESY is 'necessary to permit [the child] to benefit from his instruction.'" *Cordrey,* 917 F.2d at 1473 (citation omitted). In general, this standard is satisfied when it is shown that the student will suffer some significant regression of skills or knowledge without a summer program, followed by an insufficient recoupment of the same during the next school year. *See id.* at 1470. However, several courts have warned against "converting what should [be] a multifaceted inquiry into application of a single, inflexible criterion." *Johnson,* 921 F.2d at 1031. *See also Cordrey,* 917 F.2d at 1472; *Polk,* 853 F.2d at 184; *Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.,* 790 F.2d 1153, 1158 (5th Cir.1986).

Plaintiffs claim that MCPS limits its analysis of ESY eligibility in individual cases to a regression-recoupment standard that violates the IDEA. In so claiming, they echo the 1989 decision of the HRB which found that MCPS "adhered to a single criterion of severe regression and limited recoupment and this standard in itself is too limiting." (Pl.'s Ex. 53.) Any student evaluation that uses a single-criterion test to determine an appropriate educational program would violate the Act. 20 U.S.C. § 1412(5) (Supp.1994); *Hall,* 774 F.2d at 635.

Defendants respond by denying the allegation, claiming reliance on the established Maryland standard, and criticizing Plaintiffs as unable to articulate any alternative other than an unworkable *ad hoc* standard. Here again, Defendants' briefs present more literary than legal merit.

The Maryland regulations set forth the following standard by which ESY eligibility is to be determined:

> In making its determination whether to provide [ESY] ..., the [ARD] Committee shall consider whether there is a likelihood of substantial regression of critical life skills caused by the normal school break and a failure to recover these lost skills in a reasonable time.

COMAR § 13A.05.01.09(G)(2). MCPS's ESY guidelines have mirrored this standard, listing as relevant factors the nature and severity of the disability, the student's IEP objectives, the severity of past or projected regression, and the rate of recoupment. In 1993, in an apparent attempt to address criticisms that its standard was too narrow, MCPS followed its list of factors for consideration with the following:

> These factors are not exclusive of other factors and all factors relevant to the students [sic] individual needs should be considered.

(1993 MCPS ESY Guidelines, Pl.'s Ex. 8.)

While MCPS's standard may appear on paper to be broad enough to survive IDEA scrutiny, the Court finds that in practice Defendants apply a narrow, single-criterion standard under the guise of an expansive evaluation. In his testimony, Dr. Sirotkin of MCPS conceded that students in Montgomery County must display a likelihood of regression and insufficient recoupment and stated that, without a showing of likely regression, ESY would be denied. (*See* Tr. at 71–72, 77, Sept. 24, 1993.) That is in accord with the testimony of other MCPS officials. In practice, MCPS has provided ESY only when it has deemed it necessary to prevent substantial regression, bypassing other considerations relevant to the satisfaction of *Rowley*'s underlying "some educational benefit" guideline.

Defendants claim that the Sixth Circuit, in *Cordrey v. Euckert*, 917 F.2d 1460 (6th Cir. 1990), found the regression-recoupment standard to satisfy *Rowley*. That interpretation of *Cordrey* does not appear to be sound. Finding "some merit" to the proposition that "a regression/recoupment standard, *strictly defined*, would stray too far from its statuto-ry source and take on a life of its own," 917 F.2d at 1471 (emphasis added), the *Cordrey* court concluded that

> if the existing regression-based standard for ESY is *defined loosely* to allow for individualized expert opinion and not just empirical predictions based on actual prior regression, *the standard would seem flexible enough* to accommodate [a full range of] refinements in professional understanding of when a child needs an ESY.

*Id.* at 1472 (emphasis added). In sum, the *Cordrey* opinion says that while the ESY standard may be *described* by the shorthand phrase "regression-recoupment," it must be *applied* in such a way as to give meaningful effect to a broader range of factors. Based on all the evidence presented regarding the standard at issue here, this Court is unable to find MCPS's regression-based standard to be "loosely defined" or subject to "flexible" application. Thus, *Cordrey* does not support Defendants' position.

The United States Court of Appeals for the Fifth Circuit, explained that regression-recoupment

> is, of course, a general standard, but it must be applied to the individual by the ARD Committee in the same way that juries apply other general legal standards such as negligence and reasonableness.

*Alamo Heights*, 790 F.2d at 1158. Understood in this way, a variety of nonregression-based factors—for example, "emerging skills" and "breakthrough opportunities" (as when a child is on the brink of learning to read)—can and should be incorporated into the eligibility analysis. This, in turn, will enable MCPS to meet the *Rowley* mandate, that its educational programs be designed to produce some more-than-trivial progress for disabled students. *See Hall*, 774 F.2d at 636. Moreover, construing the standard in this manner belies Defendants' concerns about ad hoc evaluations and shields the Maryland regulation itself from questions of infirmity under the IDEA.

MCPS must, henceforth, use a correct standard for determining whether ESY will be made part of a disabled child's IEP.

## B. Inconsistent and Arbitrary Application

Plaintiffs claim that MCPS applies its ESY guidelines in an arbitrary and inconsistent manner, thereby preventing deserving students from receiving such services. Among its examples of the impediments causing this problem, Plaintiffs list MCPS's single-minded reliance on summer enrichment programs, failure to address ESY at annual reviews, confused interpretation of the term "critical life skills," and inappropriate comparison of the services provided to public and nonpublic special education students. Defendants, in essence,[18] deny committing any violation.

The Court has previously noted that Plaintiffs are correct with regard to MCPS's unjustified substitution of tuition-charging summer enrichment programs for ESY and MCPS's failure to address ESY at annual meetings. The remaining allegations warrant discussion.

### 1. Interpretation of "Critical Life Skills"

■ Plaintiffs assert that MCPS interprets "critical life skills," the focus of the regression-recoupment analysis, to require academic regression for students most likely to have behavioral problems and behavioral regression for students most likely to have academic problems. Such a practice—designed to misfocus ESY analysis and prevent deserving children from qualifying for it—would certainly raise an issue under the IDEA. However, it does not appear that MCPS is guilty of this offense. As front-line educators in Montgomery County daily facing individual students with complicated mixtures of academic and behavioral problems, they must have flexibility in the interpretation of the term "critical life skills." This, in fact, conforms with the expansive definition of the term adopted by the Maryland State Department of Education ("MSDE"), including "any skill determined by the [ARD] Committee to be critical to the student's overall

educational progress." (Resource Information for Extended School Year Services, Apr. 1993, issued by MSDE, Pl.'s Ex. 10, at 3.)

The evidence does not warrant a finding that MCPS engaged in the practice of defining "critical life skills" in a rigid, unreasonable or improper manner.

### 2. Mischaracterization of Nonpublic School Program

■ Put bluntly, as it must be, MCPS has sought to play fast and loose with reality in order to project the appearance of providing a reasonable level of ESY for disabled students. The "gimmick" used was for MCPS to assert that disabled students in nonpublic schools with programs in excess of 180 days were receiving ESY. The Court does not accept this mischaracterizations of the facts. The problem in this regard is not the different treatment of public and nonpublic school students,[19] but rather Defendants' manipulation of statistical data as to the nonpublic school group to mask its deficiencies in the provision of ESY to the public school group.

When MCPS sends a student with a disability to a nonpublic school, that child is usually sent to either Frost School, The Episcopal Center for Children, or Broschart School. All three schools program their regular school years for a period longer than 180 days. Frost has a twelve-month program, Episcopal runs eleven months, and Broschart incorporates a summer component into its programming that essentially gives it an eleven-month school year. Children at these schools receive their education based on a single, year-long IEP. They undergo no regression-recoupment analysis to determine if they need additional services, primarily because the length of the existing programs would make such a determination immaterial.

While there is nothing wrong with this type of educational programming, it is not

---

**18.** Amid Defendants' counsel's attacks on Plaintiffs' "preconceived policy goals," "willful misunderstanding of [MCPS] procedures," "ignorant" experts, and "bizarre" conclusions is enough substance to lead the Court to conclude that they disagree with the Plaintiffs.

**19.** Both federal and state regulations provide for different treatment of students in nonpublic placements. See 34 C.F.R. § 300.400–.452; COMAR § 13A.05.01.12. Students placed in nonpublic schools, however, are guaranteed the same broad procedural protections as students placed in public schools. 34 C.F.R. § 300.401(b); COMAR § 13A.05.01.12(C).

ESY. Maryland regulations define ESY as *"an individualized extension of specific services* beyond the regular school year...." COMAR § 13A.05.01.02(B)(1) (emphasis added). The decision of the nonpublic schools to continue their regular programming through the summer and the decision of MCPS to place its students in that type of program—both within the sound discretion of those institutions—prevent either from labeling those services "ESY."

Even if the summer services provided at these nonpublic schools were deemed to be ESY, they cannot be lumped together with those services provided to public school students for purposes of gaining a meaningful understanding of MCPS's practices. Because the nonpublic programs run through the summer rega dless of the individualized needs of individual students, the cost of the summer education provided to these students is incorporated into the initial cost of their placement. MCPS would suffer no additional expense by liberally granting so called "ESY" to these students.

Providing ESY to public school students (with a 180 day school year) does place an additional financial burden on MCPS. MCPS must contribute extra funds, staffing, and resources for any ESY the students receive. Consequently, a *combination* of public and nonpublic statistics is misleading. A more accurate insight into MCPS' ESY practices is gained by a *comparison* of the treatment of public *vis-a-vis* nonpublic school students.

Focusing on Intensity V students in MCPS, those with the most severe disabilities in day-programs,[20] it becomes apparent that the number of students in public schools receiving ESY is alarmingly low in comparison to similarly situated students in nonpublic schools. Of the approximately one thousand students attending the eight public schools providing services only to Intensity V students, only four students received ESY in 1992. None of the approximately 50 students at Longview, which serves students

with severe and profound mental retardation, received ESY. None of the approximately 105 students at Rock Terrace, which serves students with multiple disabilities (generally including mental retardation), received ESY. And no student at McKenney Hill Learning Center, which also serves students with multiple disabilities, received ESY.

In the public schools offering day programs to Intensity V children labeled seriously emotionally disturbed ("SED"), none of the 225 or more students at Mark Twain's main campus, none of the approximately 90 students at RICA, and none of the 18 students at Taylor Learning Center received ESY in 1992. By contrast, 59 students labeled SED who were placed in nonpublic programs by MCPS received ESY that summer. In assessing these numbers, the Court is once again reminded of the Fifth Circuit's pointed observation: "Statistics are not, of course, the whole answer, but nothing is as emphatic as zero." *Hinds County Sch. Bd.,* 417 F.2d at 858. And, in this limited example, six zeros are more emphatic than one.

Overall, only approximately 140 out of approximately 11,100 disabled students in Montgomery County (slightly more than 1%) received ESY in 1992. (Pl.'s Ex. 1, chart 9.) Broken down, that year's figures show that only about 60 of 10,600 students in public schools received ESY (0.1%) while about 80 of 450 students in nonpublic schools (15%) received such services. (Pl.'s Ex. 1, chart 10.) Of the approximately 8700 students receiving Intensity I, II, III, or IV in Montgomery County, none at all received ESY. (Pl.'s Ex. 1, chart 12.) In sum, these statistics reflect a pattern and practice of a school board that has avoided its obligation to provide ESY to disabled students when appropriate.

## C. *Individualization Requirements*

Plaintiffs claim that ESY decisions are not individualized because students who receive ESY are placed in fixed-length pro-

---

**20.** In Maryland, a continuum of educational placements are provided for disabled students based on a system of six "intensity" classifications. Intensity I would be for the least severely disabled students while Intensity VI would be for students in need of residential treatment. *See* COMAR § 13A.05.01.10(E).

grams and that ESY placements do not take into account the LRE requirement.

The Fourth Circuit has stated that under the IDEA, placement is to follow the development of an individualized program, and not vice versa. *See Spielberg,* 853 F.2d at 259. Under both Federal and State law, ESY is to be provided under a properly developed IEP, taking into account LRE. *See, e.g.,* COMAR § 13A.05.01.09(G)(3).

The evidence presented at trial established that there was little, if any, consideration of the appropriate duration of individual ESY programs at annual review meetings. (*See* Sirotkin testimony, Tr. dated Sept. 24, 1993, at 117.) Moreover, the evidence revealed that in certain cases students were receiving uniform, fixed-length ESY programs based solely on the length of existing summer school/enrichment programs. (*See* Pl.'s Ex. 1, chart 21.) While these programs may have been appropriate for the students placed in them, no individual evaluation was made to ensure that this was the case.

In the future, MCPS must make individualized determinations of the number of weeks, days per week, and hours per day that each student receiving ESY should be provided. This is required under MCPS's own 1992 and 1993 ESY guidelines. Of course, the Court does not interpret the IDEA to require these decisions to be made in a vacuum, without any consideration of programs already in existence and the rational administration of county resources. Rather, putting the existence of fixed-length programs in their proper place in the IDEA hierarchy, MCPS first must determine the child's individualized summer needs and *then* determine whether an existing program can satisfy those needs. In any event, Defendants must make allowances and adjustments in those instances when a child's individualized needs cannot be met by an existing summer program.

#### D. *Least Restrictive Environment ("LRE") Requirements*

■ The Court finds that the LRE requirements are not being considered for students who have been found to qualify for ESY. Many students—for example, those in the autism program—who were educated with nondisabled students during the regular school year received their 1992 ESY in a segregated environment. Moreover, MCPS educators have testified that LRE was not even a topic of discussion at annual review meetings. At one point, the Acting Director of Special Education testified that she did not "see [LRE] as germane to the issue of extended school year." This attitude cannot continue. However, the express language of the Maryland regulations requires due consideration to LRE concerns.

While MCPS must recognize LRE as a component of ESY in the future, the Court does not read the IDEA to mandate indifference to legitimate practical considerations or interference with other school programming to create artificial LRE settings during the summer months. Considering, however, the extensive number of programs offered by MCPS during the summer (as listed in its *"Elementary and Secondary Summer School Programs"* brochures) there appear to be ample opportunities to mainstream ESY recipients when appropriate.

### VI. *ATTORNEY'S FEES*

■ Courts, in their discretion, may award reasonable attorney's fees to parties who have prevailed in actions under the IDEA. 20 U.S.C. § 1415(e)(4)(B) (Supp. 1994). It is beyond question that Plaintiffs have prevailed in the present dispute. *See Combs v. School Bd. of Rockingham County,* 15 F.3d 357, 360–61 (4th Cir.1994). As a consequence, and also because Plaintiffs' efforts will result in a substantial benefit to all disabled children in Montgomery County, the Court will exercise its discretion in favor of awarding such fees.

### VII. *REMEDIES*

The duty of this Court is to ensure that the Montgomery County School System meets its legal obligations. It shall do so while bearing in mind that—as long as acting consistent with its legal obligations—the school system should be permitted to performs its

education function in accordance with its best professional judgment.[21]

There shall, promptly, be supplemental proceedings so that the Court can be assisted by the parties in drafting order(s) to provide relief consistent with this decision.

## VIII. CONCLUSION

For the foregoing reasons the Court concludes that:

1. Defendants have violated the Individuals with Disabilities Education Act by:

   a. Failing to provide adequate notice regarding ESY to parents of disabled students.

   b. Utilizing procedures that delay decisions regarding the providing of ESY to disabled students.

   c. Making decisions on ESY too late in the school year.

   d. Failing to address ESY at annual review meetings, and failing to document the required discussions of ESY.

   e. Failing to apply a proper standard for the determination of whether students should receive ESY as part of their IEPs.

   f. Failing to comply with requirements for an individualized program, including LRE considerations when ESY is offered.

2. Defendants must forthwith come into compliance with IDEA.

3. An appropriate Order shall be issued to insure that Defendants cease and desist from their violations of the IDEA.

4. Plaintiffs are entitled to recover their expenses, including legal fees, with regard to the Class Action aspects of this case.

---

**21.** The Court is mindful of the Supreme Court's warning in *Rowley* that "courts must be careful to avoid imposing their view of preferable educational methods upon the States." 458 U.S. at 207, 102 S.Ct. at 3051.